CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

SOPHIA COOPER (CABN 320373)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6473
    Fax: (415) 436-7234
    Sophia.cooper@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | ) | NO. 3:22-CR-00398-VC |
|---|---|---|
| Plaintiff, | ) | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| v. | ) | |
| NICHOLAS ANTHONY TABOR, | ) | Hearing Date: November 5, 2025 |
| Defendant. | ) | Hearing Time: 1:00 p.m. |
| | ) | Judge: Hon. Vince Chhabria |
| | ) | Court: Courtroom 4; 17th Floor |

## I. INTRODUCTION

Nicholas Tabor appears before this court for sentencing having pleaded guilty to one count of Possession with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Based on the nature of the offense and the defendant's history, the government requests a sentence of 18 months' imprisonment, followed by 3 years of supervised release.

## II. OFFENSE CONDUCT

Tabor admitted that, while living in San Francisco's Sunnydale neighborhood, he worked as a re-shipper for a dark web drug vendor based in Pennsylvania called "BestBenzos." Dkt. 19. Over a six-month period in 2021, he mailed some 337 packages, all filled with counterfeited pills with controlled

and non-controlled substances, including Xanax, 2C-B (a hallucinogen), oxycodone, ecstasy, and methamphetamine. *Id.*; *see also* PSR ¶ 13. This was dangerous and illegal, because he was sending to customers potent drugs whose contents were, in truth, a mystery to him and to end users. (As it turned out, many of the pills had he had in his home were mislabeled.) He shipped the packages using bitcoin-paid shipping labels, a common technique to avoid detection as a sender. *Id.*; *see also* PSR ¶¶ 13-16.

Tabor was also using Telegram and Wickr, encrypted chat apps, under the moniker "Ultraness," to sell pills. *See id.* ¶¶ 14-16. In October 2021, for instance, he sold an undercover officer what Tabor claimed were 10 mg oxycodone pills. The undercover had asked for "Rx or press," which is street terminology for whether the pills came from the production line of a lawful pharmaceutical facility (and thus can be presumed to be actual oxycodone in the amount of 10 milligrams) or are the creation of an illicit operation without oversight (and with no way of controlling what or how much of a substance was in the pill). Tabor assured the UC: "Press but real oxy." *See id.* ¶15. How Tabor justified this assurance is unknown. In fact, the pills, on lab testing, contained xylazine, *see id.*— a tranquilizer used in veterinary medicine. In another communication with the undercover, Tabor advised his buyer to tell customers to make sure that the customer knew that the bars "smack hard"—that is, are potent—"so take it slow." *See id.* ¶16.

Agents from the United States Postal Inspection Service (part of the Northern California Illicit Digital Economy Task Force) executed a search warrant on his residence and found some 20,000 pills that Tabor admitted he intended to sell. *See id.* ¶19. These pills included controlled substances (MDMA, methamphetamine) and non-controlled substances like xylazine, flubromazolam (also known as liquid Xanax), clonazolam, Bromazolam, anti-depressives (escitalopram), and blood pressure medications (propranolol). *See id.* ¶¶ 18-19. When his home was searched in February 2022, Tabor told agents that "BestBenzos" paid him a 20% share of the amount of each order he reshipped. PSR ¶ 13.

### III. PROCEDURAL HISTORY

Despite the seriousness of Tabor's criminal conduct, the government exercised its discretion to offer Tabor an 18-month pretrial diversion agreement. Doc. 19. The offer was consistent with the office's pretrial diversion policy, which allows diversion in cases involving first-time offenders whose

conduct appears to be aberrational.  The government recognized that Tabor was largely functioning as a re-shipper—being paid a small amount to carry out the shipping and receiving aspects of the distribution chain.  The government also recognized that while Tabor had attempted to act as a supplier in his own right, that conduct represented only a limited portion of his overall wrongdoing.  The government concluded, after discussions with the defense, that Tabor was capable of pursuing a different path.  Accordingly, the government decided to afford him an opportunity to demonstrate that commitment.

However, in February 2025, as the government was assessing Mr. Tabor's compliance with the diversion agreement, the prosecutor learned that, beginning in July 2024, Tabor had been receiving packages paid for with postage purchased using cryptocurrency.  These packages shared the same characteristics as those that led to his original arrest: white USPS envelopes of similar weight, each bearing commercially printed postage purchased through a third-party reseller that accepts cryptocurrency.  As in the earlier investigation, postal inspectors were able to identify these similarities by reviewing parcel images and weights, without seizing or opening the packages.

The government inquired with the defense regarding these parcels.  Through counsel, Tabor attributed the packages to legitimate purchases – some allegedly made by his partner from Oaktown Spice Shop in Albany, and others from Etsy.  Upon further inquiry, the government confirmed that no such Oaktown Spice Shop order existed: the company had no record of a sale, and the listed return address was invalid.  The Etsy orders, by contrast, had indeed been placed, but by Tabor himself.  Email records revealed that Tabor had altered electronic receipts to make it appear that the purchases had been made by his partner, when in fact they had not.  The supposed contents of the packages (items such as a $279 movie poster or a Nintendo console) were also far too large to fit within the small envelopes actually received.  In short, the evidence showed that Tabor had resumed illegal drug-related activity and then attempted to conceal it through fabricated documentation and false explanations.  In fact, in order to hide his tracks, he found Etsy receipts and a spice order that roughly corresponded to the dates of those packages (though with inconsistencies were such that the dates did not actually match up).

Tabor's diversion agreement required him to not violate any laws and to adhere to the terms of his pretrial release.  His plea agreement, meanwhile, required that he "not to commit or attempt to

commit any crimes before sentence is imposed"; to not "violate the terms of my pretrial release"; and to "not to intentionally provide false information to the Court, the Probation Office, Pretrial Services, or the government." He broke those promises with this new conduct.

## IV. SENTENCING GUIDELINES CALCULATION

Pursuant to the plea agreement, the parties agreed that the calculation is as follows: Base Offense Level (26), pursuant to U.S.S.G. §2D1.1(a)(5) & (c)(8); Safety Valve (-2), pursuant to U.S.S.G 2D1.1(b)(18) & 5C1.2(a); Acceptance of Responsibility (-3), pursuant to U.S.S.G §3E1.1; for an adjusted offense level of 21. Probation determined a base offense level of 26, with adjustments for (-2) Zero-Point Offender and (-3) for Acceptance of Responsibility, resulting in a total offense level of 21 (based on the fact that the defendant had not, at that time, qualified for Safety Valve). The government agrees with Probation that the defendant does not have any prior convictions and thus additionally qualifies for Zero-Point Offender (-2), pursuant to U.S.S.G. § 4C1.1a, resulting in an adjusted offense level of 19.

## V. APPLICABLE LAW

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id.* After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991–93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(5) the need to provide restitution to any victims of the offense.

## VI.   RECOMMENDED SENTENCE AND SECTION 3553(a) FACTORS

Based upon a consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends that the Court sentence the defendant to 18 months of imprisonment and impose a three-year term of supervised release. Such a sentence would be sufficient, but not greater than necessary, given the nature and circumstances of the offense and the history and characteristics of the defendant.

The nature and circumstances of the offense warrant a sentence of 18 months.  The pills Tabor shipped are dangerous to the public insofar as they contain potent drugs, of unknown quantity and quality, some misrepresented as other drugs.  The pills Tabor was selling are dangerous to use and dangerous to sell.  More, it is clear the defendant was running a business.  The defendant received a 20% commission on his sales, and the packages were mailed across the country—including places outside California—with no regard for whose hands they might end up in.  The defendant was selling a dangerous combination of drugs that, despite his assurances that they were "real," were often times not.  In fact, the defendant admitted he did not know, in many instances, what any of the substances were contained in the pills he possessed.  More, as part of the diversion program, he was given a chance to prove that a more lenient sentence would deter him.  In addition to not completing the diversion program, he is facing state charges in San Diego for falsifying heath records.  That case is currently pending. *See* PSR at 21.  According to the PSR, the defendant unlawfully received health care for which he was not eligible based on a false declaration.  He also submitted false in-home supportive services (IHSS) time sheets. *Id.* at 11.  Defendant's behavior, when taken together, reveals a fabric of dishonesty and warrants a meaningful period of incarceration.

At the same time, the government acknowledges Probation's recommendation for a sentence of 8 months, as well as the defendant's background and circumstances.  In addition, his role as the sole caretaker for his partner provides some mitigation that the Court should consider. *See* PSR at 7, 18. An

18-month sentence, below the 30-37 months range, is still the appropriate sentence in this case, for this defendant, given these circumstances.

## VII. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court impose a sentence of 18 months' imprisonment and order a three-year term of supervised release.

Dated: October 29, 2025

CRAIG H. MISSAKIAN
United States Attorney

/s/
SOPHIA COOPER
Assistant United States Attorney