ALANNA D. COOPERSMITH, CBN 248447
Attorney at Law,
420 Third Street, Suite 250
Oakland, California 94607
T-(510) 628-0596
F-(866) 365-9759
alanna@eastbaydefense.com

Attorney for Defendant,
Nicholas Tabor

UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>NICHOLAS TABOR,<br><br>Defendant. | NO. 22-CR-00398 VC<br><br>DEFENDANT NICHOLAS TABOR'S SENTENCING MEMORANDUM<br><br>Date: November 5, 2025<br>Time: 1:00 p.m.<br>Hon. Hon. Vince Chabbria |

22-CR-398 VC  Sentencing Memo.

**TABLE OF CONTENTS**

INTRODUCTION……………………………………………..……………..………..1

FACTUAL BACKGROUND………………..……………………………………………..1

    A. Defendant's Personal History and Characteristics ……………………….....1

        1. An Isolated Childhood Beset with Mental Health Challenges…………….1

        2. A Promising Career in Broadcast Journalism………………………………1

        3. An "Instant Connection": Reverence for his Wife Whom He…………
           Tirelessly Supports and Comforts………………………………………….2

    B. Nature and Circumstances of Offense…………………………....……………..3

LEGAL ARGUMENT………………………………………………………………..3

I.   The Guidelines Range…………………………...…………………….….….…3

II.   A Sentence of One Year of Home Confinement Would be Sufficient.………...….4

      A. Nicholas was Motivated Only by the Need to Help his Ill Partner………….4

      B. Incarcerating Nicholas Would Leave No One to Care for His Wife………..5

      C. Nicholas Has Mental Health Needs that are Addressed in the Community...5

      D. Nicholas Would Benefit from Treatment and Guidance, Not Hard Time….5

CONCLUSION……………………………………………………………..…....……6

# Table of Authorities

**Statutes**

18 U.S.C. § 3553……………………………………………………………………....…passim

18 U.S.C. § 3561……………………………………………………………………………..4

21 U.S.C. § 841……………………………………………………………………………..4

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007)…………………………………………………….4

*Kimbrough v. United States*, 552 U.S. 85 (2007)……………………………………………..7

*United States v. Barker*, 771 F.2d 1362 (9th Cir. 1985)………………………………………4

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008)…………………………………………4

*Williams v. New York*, 337 U.S. 241 (1949)………………………………….………………4

# INTRODUCTION

On December 1, 2022, Nicholas Tabor was arraigned on a one-count indictment charging distribution of methamphetamine. At the time of his out-of-custody arraignment up until now, he was living in San Diego with his wife and mother. The indictment stems from a period in which Nicholas was living with his wife and her family in San Francisco. Resources were incredibly scarce. Overwhelmed by his wife's worsening mental health, he went on the dark web to obtain Xanax for her. He then started distributing Xanax and other substances through the mail. The proceeds were used to buy ketamine, an expensive and experimental drug that he used to treat his wife's treatment-resistant depression.

# FACTUAL BACKGROUND

A. Defendant's Personal History and Characteristics

### 1. An Isolated Childhood Beset with Mental-Health Challenges

Nicholas lives to this day in the family home in San Diego in which he was raised by his mother and grandmother.

His father split when he was three. Although there exist half-siblings on both his mother's and father's side, he hardly knew them. His father was in and out of his life. PSR ¶¶ 43-44.

When Nicholas was still in elementary school, his grandmother passed away. An aunt from Canada then moved in with her mentally-ill daughter.

Nicholas struggled in school at first. But by middle school he did better, when an IEP was put in place for ADHD, anxiety, and depression. A psychiatrist prescribed him medication for ADHD, anxiety, and depression. PSR ¶¶ 52, 56; Exhibit I. He was also diagnosed as being on the autistic spectrum. Exhibit I.

### 2. A Promising Career in Broadcast Journalism

Nicholas developed an interest in broadcast journalism while in high school. By all accounts, he excelled.

In eleventh grade, Nicholas was one of five high school students tapped to edit documentaries made by a local film producer. An article in the local newspaper described Nicholas as "trained to fully operate the broadcast studio" and "very technically knowledgeable

and experienced in editing." Exhibit B.  The broadcast journalism teacher at Madison High School wrote a college-admissions letter describing Nicholas as a stand-out, stating "Over the past 22 years of my career in broadcasting and teaching, I have never had another student so dedicated to learning and working in the field of broadcast television as Nick."  Exhibit C.  "Nick is an exceptionally dependable, hardworking, bright young man that learns quickly and is always eager to take on new responsibilities and challenges.  Nick would often stay late or come in early to ensure that production deadlines were met."  *Id*.

Nicholas earned two Associates degrees at San Diego Community College with High Honors.  Exhibit A.  In college, Nicholas interned for video productions and worked as a student journalist.  PSR ¶ 58; Exhibits D and E.

### 3. An "Instant Connection": Reverence for his Wife Whom He Tirelessly Supports and Comforts

A few months before he completed college, Nicholas met someone online.  After chatting remotely for a while, Nicholas invited her to visit him in San Diego.  It was an "instant connection."

After Dominique returned to San Francisco, her depression crept up full force.  There was only one thing Nicholas could do: move to San Francisco.  Within one week, Nicholas was living with Dominique and her father and sister in a housing project in San Francisco.

Nicholas knew that Dominique suffered from mental illness.  But he loved her in spite of, or because of, it.  He forgave her eccentricities, a fellow traveler with autism, anxiety, and depression himself.

In July of 2017, a traumatic event happened for which Nicholas blames himself.  When he went to use the bathroom, he accidentally left the door of their bedroom open, allowing the feral cat belonging to Dominique's father to slip into the room and maul to death Dominique's cat Tarot.  This tragedy caused inestimable damage to Dominique's mental health.  As Nicholas puts it:

> If I had to describe my wife after that day in comparison to the person she was before that day in just one word, it would be 'Broken'. My wife was never the same after that. Her depression and suicidal ideation skyrocketed to insane levels. To the point I felt it was

>     dangerous to leave her by herself for any long periods of time. I had moved here to try and help her, and instead I did irreparable damage. I basically destroyed the person she was and left a shell of who she used to be behind, when all I wanted in the world was for her to be happy.

Exhibit F.

### B. Nature and Circumstances of Offense

Nicholas married Dominique in 2019. In all this time, he did not obtain a job, as he assumed he would do in San Francisco. He could not leave his wife for any significant period of time for fear of her becoming severely distressed or hurting herself. He and his wife had to make do on general assistance, food stamps, and her Disability benefits.

What kept Nicholas up at night was where to find a job, or even how to get enough food, but what he could do to make his wife comfortable. He vowed to help and protect her. He felt guilty for the loss of her cat – and the marked deterioration in her health that followed, and would do anything for her to feel even a little bit better.

It started with purchasing Xanax for his wife on the dark web. Until one day, the seller, who Nick knew by the screen name of BestBenzos, made him an offer. BestBenzos would pay Nicholas in crypto and a supply of Xanax for his wife. All Nicholas would have to do was re-ship pills to the addresses supplied by BestBenzos. Nicholas agreed. He also distributed pills through Telegraph and Wickr. He used virtually all the money he made to buy ketamine, which was a costly therapeutic for his wife's treatment-resistant depression. Exhibit F.

## LEGAL ARGUMENT

### I. The Guidelines Range

Probation calculated Mr. Tabor's base offense level as 26. It deducted 3 points for acceptance of responsibility and 2 points for zero-point offender, leaving an adjusted offense level of 21. Because Mr. Tabor proffered after the PSR was prepared, the parties agree that Mr. Tabor is entitled to an additional 2-point reduction for safety valve. This gives him an adjusted offense level to 19. The range under the Sentencing Guidelines for an individual in criminal history category I and that offense level is 30-37 months in prison.

The Sentencing Guidelines are advisory.

The mandate of the court under 18 U.S.C. § 3553(a) and Article III of the Constitution is to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985). "While the Guidelines factors are to be respectfully considered, they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). Punishment "should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). This requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes, magnify, the crime and punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotations omitted).

The ultimate task of the court is to impose a sentence that is "sufficient, but no greater than necessary" to satisfy the objectives of punishment under 18 U.S.C. § 3553(a), including reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment; affording deterrence; protecting the public from further crimes of the defendant; and providing needed medical care and other kinds of correctional treatment. 18 U.S.C. § 3553(a)(2).

The court must consider "the kinds of sentences available." 18 U.S.C. § 3553(a)(3). This offense does not carry a mandatory prison sentence. 21 U.S.C. § 841(b)(1)(C). An option of Probation, for anywhere from one to five years, is available. 18 U.S.C. § 3561(c)(1). If the court chooses to impose a term of imprisonment, a period of supervised release for three or more years is required. 21 U.S.C. § 841(b)(1)(C).

**II.   A Sentence of One Year of Home Confinement Would be Sufficient**

Given the nature and circumstances of the offense and history and characteristics of the defendant, a sentence of probation or supervised release, with a search clause and other standard terms of criminal supervision, and up to one year of home confinement, would be sufficient.

    **A.   <u>Nicholas was Motivated Only by the Need to Help his Ill Partner</u>**

Nicholas Tabor was devoted to his wife, perhaps to a fault. He gave up a promising career in broadcast journalism to be her rock, never mind that meant not having nearly enough money,

not being able to develop interests outside the home, and having a daily existence of tedium punctuated by fits.

Nicholas was not, and is not, phased by a lavish lifestyle or fancy cars. He has no need for fame or popularity. His sole motivation was to give his wife relief from dark and unrelenting mental illness.

The mistake Nicholas made of distributing narcotics through the mails was born of desperation. Desperation to help his wife, and not himself.

### B.  Incarcerating Nicholas Would Leave No One to Care for His Wife

Nicholas's mother, with whom he and Dominique live in their house in San Diego, has Diabetes, an autoimmune disease, and chronic pain. Exhibit I. She is overweight and walks with a cane. PSR ¶ 48. She could not care for Dominique were her son to go to prison.

To be clear, Nicholas's wife is sometimes manic and suicidal. She exhibits age regression. She can experience meltdowns that involve banging her head repeatedly and throwing objects. Her diagnoses include autism spectrum disorder, ADHD, major depressive disorder with anxious distress, PTSD, gender dysphoria, selective mutism, and developmental coordination disorder. *See* PSR ¶¶ 46-47; Exhibits J-L. Were Nicholas to be absent, his wife would be unconsolable, which would put her at risk to not only herself, but others.

### C.  Nicholas Has Mental Health Needs that are Addressed in the Community

Nicholas Tabor has been treating with a psychiatrist himself for many years. He is prescribed Adderall in the morning and afternoon for ADHD. He is prescribed Lexapro and Wellbutrin for depression and anxiety. He takes an injectable medication for obesity. PSR ¶¶ 51, 53. The need to provide the defendant with medical care militates in favor of treatment in the community. 18 U.S.C. §§ 3353(a)(2)(D) and (3).

### D.  Nicholas Would Benefit from Treatment and Guidance, Not Hard Time

Nicholas Tabor presents as a non-violent, first-time offender. He was cooperative with government agents to the point that he was summoned to court in a drug distribution case. He does not use recreational drugs or alcohol. He lives with his wife and mother, providing assistance to them both in the family home. PSR ¶ 48.

Society would not benefit by sending Nicholas to prison. Nor would prison teach Nicholas a lesson; or cause him to gain insight into his behavior. As an anxious and socially awkward young man, it would do neither.

Cognitive behavioral therapy and criminal supervision through Probation would likely help Nicholas make better decisions on his own behalf and on behalf of his wife. An expanded search provision that includes computers and electronic devices could be directed. Nicholas now earns compensation from California In-Home Supportive Services of about $1,500 per month to care for his wife.

## CONCLUSION

Nicholas Tabor acknowledges his wrongful conduct. He appreciates the seriousness of his behavior. In this respect, he understands that justice requires the court to avoid sentencing disparities that are unwarranted. The circumstances in which he distributed drugs through the dark web – frustration that otherwise he couldn't afford innovative medical treatment for his wife – diminishes his culpability. Conditions of probation or supervised release can be fashioned, up to and including house arrest, with an exception for leaving the house to buy groceries or obtain medical care for himself and his wife, to impose a just punishment.

Dated: October 30, 2025

Respectfully submitted,

_____
Alanna D. Coopersmith
Attorney for Defendant,
Nicholas Tabor